J-S52045-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: ADOPTION OF: A.C.  : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
APPEAL OF: A.N., MOTHER  : No. 1336 EDA 2014

Appeal from the Decree Entered April 8, 2014
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2013-A-0199

BEFORE: GANTMAN, P.J., ALLEN, J., AND FITZGERALD, J.*

MEMORANDUM BY GANTMAN, P.J.:  **FILED AUGUST 20, 2014**

Appellant, A.N. ("Mother"), appeals from the decree entered in the Montgomery County Court of Common Pleas, which granted the petition of Appellee, the Montgomery County Office of Children and Youth ("OCY"), for involuntary termination of Mother's parental rights as to her minor child, A.C. ("Child"). We affirm.

The relevant facts and procedural history of this appeal are as follows. In February 2012, OCY learned that Mother was incarcerated and four-year-old Child was living with a relative. After her release from jail on April 2, 2012, Mother resumed caring for Child. At that point, Mother did not cooperate with OCY. Specifically, Mother did not notify OCY regarding where the family was living. Mother did not answer her telephone or return calls from the OCY caseworker. Mother also tested positive for drugs.

The court adjudicated Child dependent on May 1, 2012. On June 13,

_____

*Former Justice specially assigned to the Superior Court.

2012, OCY placed Child in foster care, where she has remained ever since. OCY developed a Family Service Plan ("FSP") to assist Mother in regaining custody of Child. The FSP objectives included cooperation with OCY, providing for Child's basic needs, obtaining a mental health evaluation, maintaining sobriety, and avoiding additional incarceration. OCY provided Mother with services to assist her in completing the FSP goals. Nevertheless, Mother did not successfully complete the FSP goals. Mother was re-incarcerated from June 21, 2012, to November 17, 2012. After her release from jail, Mother failed multiple drug tests in 2012 and 2013. Mother also failed to maintain contact with the OCY caseworker.

On October 3, 2013, OCY filed a petition for involuntary termination of Mother's parental rights. The court conducted termination hearings on March 26, 2014, April 3, 2014, April 4, 2014, and April 8, 2014. Immediately following the April 8, 2014 hearing, the court entered a final decree terminating Mother's parental rights to Child. On April 28, 2014, Mother timely filed a notice of appeal, which included a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i).

Mother raises five issues for our review:

> WHETHER THE COURT ABUSED ITS DISCRETION IN GRANTING THE AGENCY'S PETITION TO TERMINATE THE PARENTAL RIGHTS OF [MOTHER]…BY FINDING THAT THERE IS A PARENTAL INCAPACITY OR REFUSAL TO PERFORM HER PARENTAL DUTIES, AND THAT ANY SUCH INCAPACITY OF MOTHER CANNOT OR WILL NOT BE REMEDIED BY MOTHER BECAUSE MOTHER HAS SUBSTANTIALLY COMPLIED WITH THE GOALS OF THE

[FSP] THAT REQUIRED HER TO OBTAIN TREATMENT TO ADDRESS HER SUBSTANCE ABUSE AND MENTAL HEALTH PROBLEMS, MAINTAIN STABLE HOUSING, INCOME, AND CONSISTENTLY VISIT WITH [CHILD] WHILE SHE WAS IN PLACEMENT?

WHETHER THE COURT ABUSED ITS DISCRETION IN FINDING THAT THE DEVELOPMENTAL, PHYSICAL AND EMOTIONAL NEEDS AND WELFARE OF [CHILD] WILL BE BEST SERVED BY THE TERMINATION OF BIRTH MOTHER'S BIOLOGICAL RIGHTS PURSUANT TO 23 PA.C.S. § 2511(b) AS THERE IS A STRONG BOND DOCUMENTED BETWEEN MOTHER AND DAUGHTER, AND THAT SEVERANCE OF SUCH A BOND SHALL CAUSE IRREPARABLE HARM TO MINOR CHILD?

WHETHER THERE IS SUFFICIENT EVIDENCE TO SUPPORT THE FINDINGS OF THE COURT THAT THE AGENCY PROVED BY CLEAR AND CONVINCING EVIDENCE THE REQUIREMENTS…FOR THE INVOLUNTARY TERMINATION OF MOTHER'S PARENTAL RIGHTS?

WHETHER THE COURT ERRED IN GRANTING THE AGENCY'S PETITION TO CHANGE THE GOAL FROM REUNIFICATION TO ADOPTION AS THE GOAL OF REUNIFICATION REMAINS THE MOST APPROPRIATE AND FEASIBLE GOAL BASED UPON A REVIEW OF THE STATUTORY FACTORS SET FORTH IN 42 PA.C.S. § 6351(f)?

WHETHER THE COURT HAD SUFFICIENT EVIDENCE TO DETERMINE THE APPROPRIATENESS OF CHANGING THE GOAL FROM REUNIFICATION TO ADOPTION IN THAT THE COURT IS REQUIRED TO CONSULT WITH THE CHILD REGARDING THE PERMANENCY PLAN IN A MANNER APPROPRIATE TO THE CHILD'S AGE AND MATURITY, AS REQUIRED PURSUANT TO 42 PA.C.S. § 6351(e)(1)?

(Mother's Brief at 4).

On appeal, Mother contends she made progress toward alleviating the circumstances that necessitated Child's placement.  To comply with the FSP,

Mother asserts she visited Child, maintained appropriate housing, obtained a source of income, completed drug and psychiatric evaluations, attended parenting and anger management classes, and participated in daily methadone treatments. Mother acknowledges her failed drugs tests, but she emphasizes that the "fact that [she]…tested positive on a total of six (6) occasions…since February of 2012 does not demonstrate that [she] has a settled purpose of relinquishing her parental claim to [Child]." (Mother's Brief at 15). Mother argues her recovery from drug addiction will continue for the rest of her life, and the fact that she obtained treatment demonstrates she can remedy the conditions which led to Child's placement. Mother also insists she has a bond with Child. Mother complains environmental factors alone should not form the basis for termination, where Mother can provide for Child's developmental, physical, and emotional needs. Mother concludes the court erroneously terminated her parental rights.[1] We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent

---

[1] To the extent Mother also challenges the goal change from reunification to adoption, we observe that the April 8, 2014 decree on appeal terminated Mother's parental rights. It did not simultaneously change the goal to adoption. Further, the certified record contains nothing related to goal change. Under these circumstances, we decline to address Mother's specific arguments regarding the propriety of the goal change.

> evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> > Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
> >
> > *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
> >
> > Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
> >
> > *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d

1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

OCY sought the involuntary termination of Mother's parental rights on the following grounds:

**§ 2511.  Grounds for involuntary termination**

**(a)   General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*     \*     \*

(2)   The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*     \*     \*

(8)   The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*     \*     \*

**(b)   Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the

parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (8); (b).[2] "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

"The bases for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.B.*, 990 A.2d 762, 771 (Pa.Super. 2010). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.*, 797 A.2d 326, 340 (Pa.Super. 2002) (quoting *In re J.W.*, 578 A.2d 952, 959 (Pa.Super. 1990)). The fundamental test in termination of parental rights under Section 2511(a)(2), was stated in *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such

---

[2] OCY also sought the involuntary termination of Mother's parental rights under Section 2511(a)(1), but the court found that OCY had failed to prove that termination was warranted under that section.

incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"[T]o terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003).

Under Section 2511(b), the court must consider whether termination will best serve the child's needs and welfare. *In re C.P.*, 901 A.2d 516 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child." *Id.* at 520. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P., supra* at 1121.

"It is universally agreed that the bond of parental affection is unique and irreplaceable." *In re Diaz*, 669 A.2d 372, 377 (Pa.Super. 1995).

> When parents act in accordance with the natural bonds of parental affection, preservation of the parent-child bond is *prima facie* in the best interest of the child, and the state has no justification to terminate that bond. On the other

hand, a court may properly terminate parental bonds which exist **in form** but not **in substance** when preservation of the parental bond would consign a child to an indefinite, unhappy, and unstable future devoid of the irreducible minimum parental care to which that child is entitled.

*Id.* (quoting *In re J.W., supra* at 958) (emphasis in original).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and may properly have…her rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship

> to the best of…her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations and quotation marks omitted). "[A] parent's basic constitutional right to the custody and rearing of…her child is converted, upon the failure to fulfill…her parental duties, to the child's right to have proper parenting and fulfillment of…her potential in a permanent, healthy, safe environment." *Id.* at 856.

Instantly, the court adjudicated Child dependent on May 1, 2012. On October 3, 2013, OCY filed the petition for involuntary termination of Mother's parental rights. The court conducted four hearings on the termination petition. On March 26, 2014, Mother presented testimony from Dr. Diana Rosenstein, the court-appointed psychologist who conducted the bonding evaluation in February 2014. During the evaluation, Dr. Rosenstein observed that Mother and Child were excited to see each other. Mother brought age-appropriate gifts for Child, and Mother and Child's interaction was warm and affectionate. Based upon her observations, Dr. Rosenstein confirmed that Child did have a bond with Mother. When asked about how Child would react to the termination of Mother's parental rights, Dr.

Rosenstein explained that Child would have mixed feelings:

> I think she clearly values her relationships with both of the parents.[3] I saw signs of ambivalent feelings of both parents. There were flares of anger in each observation—the observations with each parent. I inferred from that that she is angry about the separation. I don't know how much she understands about the reasons for it. I think she has a very general understanding that something happened, but I don't know [if] she knows exactly what happened to cause her to be in foster care.
>
> \* \* \*
>
> I believe that the stability that [Child's] life has right now with [Foster Mother] is something that she values greatly. I'm not sure that [Child] knows whether her parents can provide that or not. I think she's very uncertain about that.

(**See** N.T. Termination Hearing, 3/26/14, at 28.)

On cross-examination, Dr. Rosenstein testified that Mother simply ignored Child on the occasions where Child acted out or seemed frustrated. Dr. Rosenstein also characterized Mother as a reluctant participant in the evaluation process, who "resented the intrusion of OCY and the courts into her relationship with her daughter." (**Id.** at 61). Dr. Rosenstein explained that Mother made a paranoid statement regarding OCY's involvement in the case, claiming OCY is "engaged in black marketeering of children…." (**Id.** at 62). Dr. Rosenstein testified that Mother's comment raised concerns regarding the possibility of an untreated mental illness. Ultimately, Dr. Rosenstein opined that Child should remain with Foster Mother:

---

[3] Father voluntarily relinquished his parental rights to Child on April 3, 2014.

> I believe that…living with [Foster Mother] would be in [Child's] best interest, and I believe that doing that where she adopts her so that there's some finality about her living arrangements. [Child] needs some clarity about where she's going to live the rest of her childhood.

(*Id.* at 78).

At the hearing conducted on April 3, 2014, OCY presented testimony from Mother's counselor at the methadone clinic, Melissa Ann Hall, who has worked with Mother since January 2013. Ms. Hall testified that Mother currently receives a daily dose of methadone, participates in routine medication checks, and attends individual counseling sessions every other week. Although Mother showed signs of stabilization, she tested positive for drugs other than methadone on five occasions between January 2013 and October 2013. Ms. Hall also indicated that Mother failed to go to the clinic for her daily methadone on twenty-five occasions during the same period.

At the same hearing, OCY presented testimony from Leslie Hallinan, who has served as Child's caseworker since August 2012. Ms. Hallinan testified that OCY commenced in-home services for Mother in May 2012. Thereafter, Mother's cooperation with OCY declined. After Child's placement, OCY attempted to assist Mother in achieving her FSP goals and obtaining reunification with Child. While Ms. Hallinan acknowledged that Mother was receiving drug treatment at the methadone clinic, Ms. Hallinan noted Mother had tested positive for drugs other than methadone on six occasions between April 2012 and January 2014. Mother also failed to respond to

multiple requests for additional drug screenings during the same period.

After a positive drug test in January 2014, Ms. Hallinan attempted to contact Mother. Ms. Hallinan could not reach Mother by telephone, and Mother did not respond to Ms. Hallinan's voicemail messages. Ms. Hallinan also went to Mother's home. Ultimately, Ms. Hallinan found Mother at her home on January 13, 2014. At that time, Mother's "overall appearance seemed to be deteriorated," and Ms. Hallinan suspected Mother was under the influence of a controlled substance. (**See** N.T. Termination Hearing, 4/3/14, at 93.) Ms. Hallinan stressed that these incidents underscored Mother's inability to cooperate with OCY:

> I reach out to [Mother] constantly over the phone, and I try to make as many home visits as possible. The majority have been unsuccessful. And we've had numerous meetings, numerous contacts, again, [where] I have addressed her about the cooperation and that she needs to answer my phone calls or she needs to at least return my phone calls, that we need to be in communication.

(**Id.** at 95).

Regarding Child's best interests, Ms. Hallinan opined Child should remain with Foster Mother:

> [Child] flourishes in her foster home. She does exceptionally well in her foster home. She's happy. There's content. I think there's feelings of being safe and being loved. Foster mom creates an environment of structure with boundaries, with organization and a sense of normalcy. That she knows exactly what to expect pretty much every day at all times.

\* \* \*

- 13 -

> I do not feel that [Mother] understands the seriousness of—from the time of—before the time of placement to currently. Mom discredits the issues of her drug and alcohol and her mental health.

(**Id.** at 112-13). Ms. Hallinan concluded Child would not suffer permanent harm if the court terminated Mother's rights: "I don't feel that there would be a great threat to breaking any kind of bond…to have her adopted. Because this is [Child's] new normal." (**Id.** at 115).

Based upon the foregoing, the court concluded that the termination of Mother's parental rights was in Child's best interests:

> [Mother] appears to be pursuing recovery through her treatment at the methadone clinic, and that is to her credit. She has currently a stable home and has addressed many of the conditions, including completing a parenting class and anger management class. Nevertheless, the lack of cooperation with [OCY], the inconsistent responsiveness to request[s] for random drug screens, concerns about [the] consistency and stability of her drug and alcohol recovery…and her inability to communicate with [OCY] in her own best interest, all continue to be serious problems that have prevented timely reunification with her daughter.
>
> The Superior Court talking about the application of Section [2511](a)(8) said…the application of Section [2511](a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that have led to the removal of her…child. By allowing for termination when conditions that led to her removal continue to exist after a year, the statute implicitly recognizes that the child's life cannot be held in abeyance while the parent is unable to perform the actions necessary while assuming parenting responsibilities. The [c]ourt cannot and will not subordinate indefinitely a child's needs of permanence and stability to a parent's claim of progress and a hope for a future. Indeed, we work under statutory case law that contemplates only a short period…in which to complete the

process of either reunification or adoption for a child that has been placed in foster care.

I'm going to turn now to the allegation of incapacity under Section 2511(a)(2). There is evidence in the record that supports a finding of incapacity to parent which includes the following: To the extent that birth mother's lack of cooperation, canceling of meetings with the psychologist on short notice, canceling of meetings and missing of meetings with [OCY] and failure to return phone calls, and be present for scheduled meetings with the caseworker, is related to her anxiety disorder, as birth mother maintains[, this] is nevertheless evidence that the [c]ourt must consider in terms of whether [Mother] has the capacity to do everything that is necessary to adequately parent and supervise her child.

It is also relevant that despite the lengthy history of psychiatric issues and substance abuse, birth mother minimizes her need for psychiatric and psychological care and does not adequately address her mental health issues.

Also relevant is that despite being in the midst of a contested court hearing regarding her parental rights, she has no long-term plans for her child. She was unable to name the school that her child would attend if she should come to live with her.

\*     \*     \*

Dr. Rosenstein observed that…[Mother] did not demonstrate a lot of knowledge about the child's interests and activities. Birth mother also did not demonstrate an ability to form a trusting, open communication with the caseworker or with the foster mother or with the child's father, other adults important to the child and her welfare.

\*     \*     \*

Based upon the evidence in the record, much of which I have referred to but there's obviously quite a bit of evidence in the exhibits as well, the [c]ourt finds grounds to terminate parental rights under Section 2511(a)(8) and 2511(a)(2) on the basis of incapacity.

* * *

> In this case, I find that there is a parental bond between the birth mother and this child. However, I find that the bond that has developed between the foster mother and the child is stronger, and it would be in the best interest of [Child] that she be able to find a permanent home through adoption with her foster mother and maintain the safety and security that she has found there.

(**See** N.T. Termination Hearing, 4/8/14, at 45-48, 49, 52). The record supports the court's conclusion that Mother could not provide the irreducible minimum parental care for Child. **See In re Z.P., supra**; **In re B.L.L., supra**. Accordingly, we affirm the decree terminating Mother's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/20/2014

- 16 -